**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DENIS DANIEL JONES-VERBOOM,

      Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

      Defendant.

No. 16 C 8457

Magistrate Judge Michael T. Mason

## MEMORANDUM OPINION AND ORDER

MICHAEL T. MASON, United States Magistrate Judge:

      Claimant Denis Daniel Jones-Verboom ("Claimant") brings this motion for summary judgment [18] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner").  The Commissioner denied Claimant's claim for Disability Insurance Benefits ("DIB") under §§ 416(i) and 423(d) of the Social Security Act (the "Act").  The Commissioner filed a cross-motion for summary judgment [23] asking the Court to uphold the decision of the Administrative Law Judge ("ALJ").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, Claimant's motion for summary judgment [18] is granted, and the Commissioner's cross-motion [23] is denied.

## I. BACKGROUND

### A. Procedural History

On June 14, 2015, Claimant filed a Title II application for a period of disability and DIB, alleging disability beginning June 5, 2015.[1]  (R. 21.)  His application was initially denied on July 28, 2015, and upon reconsideration on September 23, 2015, after which Claimant filed a timely request for a hearing.  (*Id.*)  On February 19, 2016, Claimant, represented by counsel, testified before ALJ Patricia Kendall.  (R. 40–87.)  The ALJ also heard testimony from James Radke, a vocational expert ("VE").  (*Id.*)

On May 10, 2016, the ALJ issued a written decision denying Claimant's request for benefits, finding him not disabled under the Act.  (R. 16–51.)  The Social Security Administration Appeals Council then denied Claimant's request for review on June 29, 2016.  (R. 1–6.)  The ALJ's decision was then the final decision of the Commissioner and, therefore, reviewable by the district court under 42 U.S.C. § 405(g).  *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).  This case followed.

## B. Medical Evidence

### 1. Mental Health Records

On June 5, 2015, Claimant was brought to the emergency room at Advocate Sherman Hospital following a failed suicide attempt.  (R. 371.)  Claimant reported that he had been having difficulty with depression and anxiety for the past few months, accompanied by suicidal thoughts and feeling "overwhelmed."  (R. 373.)  He attempted suicide by overdosing on Soma, Metoprolol, and Valium.  (R. 371, 373.)  Claimant was then transferred to Alexian Brothers Behavioral Health Hospital, where he was admitted for inpatient psychiatric treatment through June 12, 2015.  (R. 374, 627.)  He reported

---

[1] Claimant was approved on a subsequent application for DIB, with disability beginning May 6, 2016. He filed an amended complaint [19] concurrently with his motion for summary judgment [18], requesting that this Court consider only the period of time from June 5, 2015 through May 5, 2016.

symptoms of decreased mood, increased anxiety, increased irritability, lack of interest, poor sleep, decreased concentration, fatigue, and feelings of hopelessness, worthlessness, and guilt. (R. 628.) Doctors prescribed Effexor XR for depression and Klonopin for anxiety, as well as Adderall. (*Id.*) Claimant's Axis I diagnosis upon discharge was severe, recurrent major depressive disorder and he was assigned a GAF score of 40-50.[2] (*Id.*)

Following the hospitalization, Claimant participated in an intensive outpatient treatment program with a psychiatrist, Dr. Syed Anwar. (R. 775–86.) He also began attending weekly counseling sessions with Nicole Hensen, LCPC. (R. 567.) At his initial evaluation by Ms. Hensen, Claimant reported poor concentration, loss of energy, increased mood swings, racing thoughts, and anxiety. (*Id.*) He stated that he had been having significant financial problems, a decline in his relationship with his spouse, and had been fired from his job before his suicide attempt. (*Id.*) Upon mental status examination, Ms. Hensen noted a depressed mood, slowed speech, decreased energy and appetite, trouble concentrating, and poor judgment. (R. 568.) Ms. Hensen assessed major depressive disorder, and recurrent, severe, and generalized anxiety disorder. (R. 569.) She assigned a GAF score of 60. (*Id.*)

---

[2] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM–IV*). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34. A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). *Id.* The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin,* 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

Dr. Fazal Khan, Claimant's primary care physician, increased Claimant's Adderall dosage on June 23, 2015. (R. 355.) On July 22, 2015, Dr. Anwar prescribed Lamictal due to complaints of mood swings and other symptoms consistent with bipolar disorder. (R. 782.) Throughout July and August, Dr. Anwar adjusted Claimant's Lamictal and Effexor XR dosages. (R. 782–86.) Claimant completed his intensive outpatient treatment program on August 26, 2015. (R. 786). At that time, Claimant reported feeling less tired and tolerating the medications well. (*Id.*) He continued to experience mood swings, but they were not as bad. (*Id.*) He denied suicidal thoughts, but continued to experience feelings of sadness and depression. (*Id.*) His prescription for Effexor XR was reduced to 25mg a day, and Lamictal was continued at 100mg a day. (R. 551, 786.) By September 14, 2015, Claimant reported feeling more positive and more motivated. (R. 616.) He indicated that he had created a structure that helped him focus on being positive, and stated that he had been communicating effectively with his spouse. (*Id.*)

Claimant followed up with Dr. Anwar on September 28, 2015. (R. 613-14.) He reported that the Lamictal helped, but he still complained of mood swings and feelings of mild anxiety and depression. (R. 613.) He also complained of back and neck pain. (R. 614.) On mental status examination, Dr. Anwar observed that Claimant appeared depressed, but improving. (*Id.*) He was fully oriented with clear thought processes. (*Id.*) Claimant had normal flow quality of speech, but he had trouble concentrating, decreased energy and suicidal ideation without intent or plan. (*Id.*) His Lamictal prescription was increased to 200mg a day, and Effexor was reduced to 75mg a day. (R. 613.) He continued taking Klonopin as needed for anxiety. (*Id.*)

Claimant also had counseling with Ms. Hensen on September 28, 2015. (R. 612.) He reported having some mild anxiety attacks, although his mood appeared to be balancing out more. (*Id.*) He was using therapy techniques, such as deep breathing and "self talk" to work though his anxiety. (*Id.*) The following week, Claimant reported to Ms. Hensen that he had been feeling down over the past few days. (R. 611.) He stated that he was in a lot of physical pain and had started seeing a chiropractor. (*Id.*) Claimant told Ms. Hensen that he worried that his disability claim would continue to be rejected and felt hopeless that he would ever feel well enough to work. (*Id.*) On October 13, 2015, Claimant reported that he had been in significant physical pain, which caused him to become depressed and frustrated. (R. 610.) He stated that his increased pain prevented him from cleaning the house. (*Id.*)

On October 26, 2015, Dr. Anwar increased the Lamictal dosage due to continued mild depression, feeling more down and having less energy. (R. 608.) Claimant also told Dr. Anwar that he recently started Neurontin medication for pain that made him drowsy. (*Id.*) In therapy that day with Ms. Hensen, Claimant reported having poor sleep and decreased motivation, but he also said he felt he was improving. (R. 607.) Ms. Hensen adjusted Claimant's treatment plan and started him on biweekly therapy. (*Id.*) On November 9, 2015, Claimant told Ms. Hensen he was anxious about finances. (R. 606.) Claimant stated that he and his spouse were overwhelmed, as they were three months behind on their mortgage. (*Id.*) Ms. Hensen noted that Claimant was unwilling to change his spending habits on food. (*Id.*)

On November 21, 2015, Dr. Anwar noted that Claimant complained of moderate depression, feeling very anxious, having difficulty around others, fatigue and sleeping

problems.  (R. 603.)  He indicated that he continued to struggle with concentration and his anxiety made it worse.  (*Id.*)  Dr. Anwar noted an appropriate affect and anxious mood.  (R. 604.)  Claimant complained of back and neck pain.  (*Id.*)  He had normal gait, balance and coordination.  (*Id.*)  Dr. Anwar also noted that Claimant had adequate, uninterrupted sleep and suicidal ideation without intent or plan.  (*Id.*)  Dr. Anwar again increased Claimant's Lamictal dosage.  (*Id.*)

Dr. Anwar also completed a Mental Capacity Assessment on November 21, 2015.  (R. 599–601.)  With regard to "Understanding & Memory," Dr. Anwar opined that Claimant had slight limitations in the ability to remember locations and work-like procedures and the ability to understand and remember very short and simple instructions, and moderate limitations in the ability to understand and remember detailed instructions.  (R. 599.)  In the category of "Sustained Concentration & Persistence," Dr. Anwar opined that Claimant had the following limitations: extreme limitations in ability to carry out very short and simple instructions; marked limitations in ability to carry out detailed instructions; extreme limitations in ability to maintain attention and concentration for extended periods; marked limitations in ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; marked limitations in ability to sustain an ordinary routine without special supervision; extreme limitations in ability to work in coordination with or in proximity to others without being distracted; moderate limitations in ability to make simple work-related decisions; marked limitations in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms;

extreme limitations in ability to perform at a consistent pace with a standard number and length of rest periods; and four or more work absences per month.  (R. 599–600.)

Under "Social Interaction," Dr. Anwar indicated the following: extreme limitations in ability to interact appropriately with the general public; marked limitations in ability to ask simple questions or request assistance; marked limitations in ability to accept instructions and respond appropriately to criticism from supervisors; extreme limitations in ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and moderate limitations in ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (R. 600.)  Finally, with regard to "Adaptation," Dr. Anwar opined that Claimant had marked limitations in ability to respond appropriately to changes in the work setting, ability to travel in unfamiliar places or use public transportation, and ability to set realistic goals or make plans independently of others, and moderate limitations in ability to be aware of normal hazards and take appropriate precautions.  (R. 601.)

In December 2015, Claimant told Ms. Hensen he was doing well with his family, although he and his spouse had not been making any mortgage payments and they had to borrow money from family to pay their bills.  (R. 798.)  He acknowledged that they do not budget properly and spend their money frivolously.  (*Id.*)  At this time, Ms. Hensen determined Claimant should follow up in one month for counseling.  (*Id.*)  On January 18, 2016, Claimant stated that he had been "managing ok" with his mood and anxiety.  (R. 797.)  He reported being worried only about his financial situation, and indicated that his self-esteem had improved.  (*Id.*)  He had been spending time with friends and working on creating hobbies to stay active.  (*Id.*)

On January 28, 2016, at his last visit of record with Dr. Anwar, Claimant complained of mild depression, but he was doing better with medications and that the mood swings were less severe. (R. 794.) His mental status remained the same. (*Id.*) Claimant stated he had been helping his brother paint a house. (*Id.*) He again complained of back and neck pain. (R. 795.) Dr. Anwar stated Claimant had bipolar depression. (R. 794.) No prescription changes were made. (R. 795.)

### 2. Physical Health Treatment Records

In 2006, infectious disease specialist, Poonam Joshi, M.D., began treating Claimant regularly for HIV, after blood tests confirmed the diagnosis. (R. 464–536.) Dr. Joshi treated Claimant for hypertension, HIV, and back pain from a previous herniated disk. (R. 464.) Claimant's HIV infection is described as controlled and asymptomatic. His viral load remains undetectable with 34 percent CD4 T helpers and 844 absolute CD4 counts. (R. 437–38, 464, 466, 589.)

On January 25, 2011, Claimant underwent a sleep evaluation by Benjamin Nager, M.D. (R. 334.) Dr. Nager's impression was severe obstructive sleep apnea syndrome and central sleep apnea syndrome. (*Id.*) A December 2015 sleep study confirmed that Claimant continued to suffer from sleep apnea. (R. 699–701.)

The records indicate that Claimant began seeing his primary care physician, Fazal Khan, M.D., as far back as February 2012. (R. 430.) In November 2013, Dr. Khan treated Claimant for headaches, which were accompanied by nausea, neck stiffness, and vomiting. (R. 410.) Dr. Khan prescribed Atripla, Bystolic, and Soma. (R. 411.) In December 2014, Dr. Khan treated Claimant for back pain, weakness, headaches, vertigo, and urinary frequency. (R. 349.) Claimant complained of lower

and middle back pain, including aching and numbness, which was relieved with chiropractic treatment. (*Id.*) He suffered from weakness in his arms and legs, which made it difficult for him to rise from a chair, climb stairs, and lift/pick up objects. (*Id.*) Dr. Khan treated Claimant for fatigue, after Claimant complained of feeling drained and tired. (R. 352.) He also treated Claimant for ADHD, depression, and overactive bladder. (R. 354, 540.) Dr. Khan opined that Claimant's ADHD caused problems at home and work, and was aggravated by deadlines, distractions, stress, and tasks involving attention to detail. (R. 391.) He further opined that Claimant's HIV diagnosis was likely causing body aches and difficulty concentrating, which made it difficult, if not impossible, to work. (R. 355.)

In August 2015, Claimant was treated by Dr. Sandhya Meesala for lumbar spine pain, noting that the pain was a six out of ten in severity. (R. 572.) Claimant complained of decreased mobility, joint pain, numbness in lower extremities, neck pain, and tingling in the legs. (R. 572, 727.) Dr. Meesala recommended that Claimant use an assistive device for stability and to prevent falls. (R. 719–20.) Claimant rated his neck pain as a seven out of ten, and told Dr. Meesala that going to the chiropractor worsened his neck pain. (R. 727, 739.) Dr. Meesala noted that a September 4, 2015 MRI scan of Claimant's cervical spine showed large central disc protrusion at C4-C5 with small central disc at C3-C4 and moderate disc bulge at C5-C6. (R. 727.) Claimant alleged that his symptoms were aggravated by bending, changing positions, daily activities, lifting, standing, and twisting, but were relieved by ice and pain medication. (R. 572.) While examining Claimant, Dr. Meesala observed that Claimant had moderately decreased range of motion in cervical, thoracic, and lumbar spine, as well as decreased

range of motion in left and right hips. (R. 575–76.) Dr. Meesala also observed decreased range of motion in the lumbar spine. (R. 576.)

In October 2015, Dr. Nager treated Claimant for neck pain and bilateral arm/hand paresthesia. (R. 582.) Claimant stated that physical therapy failed to relieve his physical pain in the past. (R. 690.) Dr. Nager's impression was mild, chronic, left C5 and C6 ridiculopathies and mild bilateral median neuropathies at the wrist, consistent with carpal tunnel syndrome. (R. 582.)

On November 3, 2015, Dr. Khan completed a physical assessment form. (R. 593–94.) Dr. Khan observed that Claimant suffered from carpal tunnel syndrome in his left hand, cervical radiculopathy at C6, and lumbar disc herniation. (R. 593.) Dr. Khan opined that Claimant had the following limitations: needed to recline or lie down during an eight hour workday in excess of regular breaks; could sit and stand/walk for under one hour during a workday; required unscheduled breaks every five to 15 minutes lasting five to 10 minutes; occasionally lift less than 10 pounds, never more than 10 pounds; limited repetitive reaching, handling, or fingering, with only 5% usage of right and left hands, fingers, and arms, in an eight hour workday; and absences totaling more than four times a month. (R. 593–94.)

Dr. Joshi also completed a physical assessment form on November 5, 2015. (R. 596–97). Dr. Joshi opined that Claimant had the following limitations based on his HIV diagnosis: interference with attention and concentration required to perform simple work-related tasks, often; needed to recline or lie down during an eight hour workday in excess of regular breaks; could sit and stand/walk for under one hour during a workday; could walk only one block without rest or significant pain; required unscheduled breaks

every five to 15 minutes lasting five to 10 minutes; occasionally lift less than 10 pounds, never more than 10 pounds; limited repetitive reaching, handling, or fingering, with only 5% usage of right and left hands, fingers, and arms, in an eight hour workday; and absences totaling more than four times a month.  (R. 596–97.)  Dr. Joshi opined that Claimant's medications could cause dizziness and drowsiness, which would interfere with his concentration at work.  (R. 596.)

### 3. Non-Examining Agency Consultants

On July 27, 2015, non-examining State agency physician David Mack, M.D., reviewed the records and opined that Claimant had no severe physical impairments. (R. 91.)  Non-examining State agency consultant Howard Tin, Psy.D., also reviewed the records and opined that Claimant had a non-severe affective disorder, with mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (R. 92–93.) Upon reconsideration on September 14, 2015, non-examining State agency consultant Lionel Hudspeth, Psy.D., also concluded that Claimant had a non-severe affective disorder.  (R. 102.)  Dr. Hudspeth further opined that Claimant had mild restriction in activities of daily living and mild difficulties in maintaining social functioning.  (*Id.*)  On September 22, 2015, non-examining State agency physician Dr. Calixto Aquino reviewed the record and concluded that, although asymptomatic, Claimant's HIV was a severe impairment because side effects of his medication "can exacerbate symptoms of fatigue."  (R. 104–05.)  Dr. Aquino opined that Claimant had the residual functional capacity to lift/carry up to 10 pounds frequently and up to 20 pounds occasionally, and could sit, stand, or walk for up to six hours in an eight-hour workday.  (*Id.*)

### C. Claimant's Testimony

On February 19, 2016, Claimant testified before ALJ Kendall regarding his impairments. (R. 42.) He testified that he lived in a townhouse and had trouble using the stairs due to muscle weakness. (R. 48–49.) He uses a cane at the recommendation of Dr. Meesala. (R. 59.) He is unable to walk more than half a block without the assistance of a cane. (R. 66–67.) Claimant testified that he is able to comfortably lift five to ten pounds and stand for twenty minutes at one time using a cane. (R. 70.) Claimant's medications cause fatigue, depression, bone pain, muscle pain, and mental fogginess. (R. 60.) An average day consists of lying in bed, reclined, and doing light dusting or cleaning, then having to lay down again for a minimum of 30 to 60 minutes. (R. 62.) He suffers daily from numbness and tingling in his legs and feet, associated with radiculopathy. (R. 67.) Physical activity worsens the numbness and tingling. (*Id.*)

Additionally, Claimant has suffered from carpal tunnel syndrome for over ten years, which causes him to drop things frequently with his hands. (R. 67–68.) The carpal tunnel syndrome has worsened over the past year, requiring him to wear splints on his wrists at night. (R. 68.) Claimant stated that he has trouble lifting, holding, and gripping with his hands. (*Id.*) He cannot write for more than a couple of minutes before the pain becomes unbearable. (*Id.*) He also has difficulty reaching his arms over his shoulders and holding his arms in front of him for long periods of time, because of the pain it caused in his neck and back, as well as the numbness in his fingers. (R. 69–70.)

Claimant testified to a history of depression and a prior hospitalization in 1999 or 2000. (R. 61.) He saw a counselor between 2004 and 2006, at which time he stopped

treatment because he was "starting to feel better emotionally." (*Id.*) In June 2015, Claimant attempted suicide after getting overwhelmed at work. (R. 62.) Claimant reported that his depression has lessened over the last six months, but he still suffers from panic attacks and has a hard time being in large groups of people or being out in public. (R. 59, 63.) When he gets panic attacks, he has trouble breathing, his chest tightens, and he feels like his heart "is going to explode." (R. 63.) These panic attacks can last up to six hours. (R. 64.) He gets confused easily, and has difficulty learning new things. (R. 70–71.) He modified his behavior to avoid panic attacks, including avoiding confrontation, being in public or large groups, and answering the phone. (R. 71.) He suffers from mood swings, which cause highs and lows in his behavior. (R. 72.) A high includes him having high energy and laughing hysterically. (*Id.*) A low includes plummeting into a deep depression for hours, if not days. (*Id.*) He has significant trouble concentrating, even during the hearing. (R. 73.)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the

Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The ALJ "must build an accurate and logical bridge from the evidence to her conclusion," although she need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 990 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted)).

### B. Analysis under the Social Security Act

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in

the national economy." *Dixon*, 270 F.3d at 1176.  Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity.  20 C.F.R. §§ 404.1520(a)(4).  "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

### C. THE ALJ'S DETERMINATION

Here, the ALJ found at step one that Claimant had not engaged in substantial gainful activity since his alleged onset date of June 5, 2015.  (R. 21.)  At step two, the ALJ concluded that Claimant suffered from the following severe impairments: affective disorder, anxiety disorder, degenerative disc disease, carpal tunnel syndrome, and asymptomatic human immunodeficiency (HIV) infection.  (*Id.*)  The ALJ also noted Claimant's non-severe impairments of hypertension, obesity, obstructive sleep apnea, history of right anterior cruciate ligament (ACL) repair, attention deficit hyperactivity disorder (ADHD), gastroesophageal reflux disease, and benign prosthetic hypertrophy (BPH).  (R. 23–24.)  Next, at step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P. Appendix 1.  (*Id.*)  The ALJ then assessed Claimant's RFC and determined that Claimant retained the capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567, except:

> He cannot climb ladders, ropes or scaffolds, can occasionally climb ramps or stairs, and can occasionally balance, stoop, crouch, kneel and crawl….

He needs to avoid concentrated exposure to workplace hazards, such as use of moving machinery and unprotected heights. He requires a cane/hand held assistive device for prolonged ambulation. He can perform work limited to simple, routine and repetitive tasks. He can handle occasional decision-making, occasional changes in the work setting, and occasional public interaction.

(R. 25–26.)  Based on the RFC assessment, the ALJ concluded at step four that Claimant was unable to perform any past relevant work.  (R. 33.)  Lastly, at step five, the ALJ found that given Claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Claimant could perform, such as general office clerk or sorter.  (R. 33–34.)  Therefore, the ALJ found that Claimant had not been under a disability from June 5, 2015, through the date of her decision.  (R. 34.)

### III. Analysis

Claimant now argues that the ALJ (1) erred in evaluating the medical opinion evidence, (2) erred in evaluating Claimant's RFC, and (3) improperly assessed the credibility of Claimant's subjective allegations.

#### A. The Medical Opinion Evidence

Claimant first contends that the ALJ erred in failing to give controlling weight to the opinions of his treating physicians, Drs. Anwar, Khan, and Joshi.  A treating physician's opinion receives controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record.  *See* 20 C.F.R. § 404.1527(c)(2); *see also Punzio*, 630 F.3d at 710.  An ALJ must offer "good reasons" for discounting the opinion of a treating physician.  *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).  If an ALJ denies a treating physician's opinion controlling weight, she is still required to determine what value it merits.  *See* 20 C.F.R. § 404.1527(c);

*Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).  In assigning that value, the ALJ

must "consider the length, nature, and extent of the treatment relationship, frequency of

examination, the physician's specialty, the types of tests performed, and the

consistency and supportability of the physician's opinion."[3]  *Moss v. Astrue*, 555 F.3d

556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c).

### 1. Dr. Anwar

The ALJ offered several reasons for giving Dr. Anwar's opinions only "some

weight."  First, the ALJ noted that Dr. Anwar provided no support for his conclusions,

even though the form specifically requests a description of the medical/clinical findings

that support his assessment.  (R. 31.)  The Court agrees.  The form is devoid of any

explanations, which is against the form's own instructions; there is no description of

evidence that substantiates Dr. Anwar's conclusions.  The incomplete nature of this

assessment casts serious doubt on its evidentiary value.  *See, e.g., Phillips v. Astrue,*

413 F. App'x 878, 881 (7th Cir. 2010) (criticizing an ALJ's reliance on a "checkbox"

opinion in which the doctor "did not explain any of his findings, or discuss the extensive

medical record, or even identify the portions of the medical record he deemed

significant"); *Jackson v. Barnhart,* No. 01 C 7387, 2003 WL 21011798, at *9 (N.D. Ill.

May 5, 2003) ("The mere fact that Dr. Gonzalez checked various boxes on a preprinted

form indicating that Jackson could perform medium work does not render his

unexplained opinion substantial evidence of Jackson's abilities.") (citing *Dixon,* 270 F.3d

---

[3]  The SSA recently adopted new rules for agency review of disability claims involving the
treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).
Because the new rules apply only to disability applications filed on or after March 27, 2017, they
are not applicable in this case.  (Id.)

at 1177 (holding that a treating physician's opinion was not entitled to controlling weight where she merely answered "yes" in response to a pre-typed question)).

Next, the ALJ found the assessment to be internally inconsistent "to some extent." (R. 31.) For example, the ALJ noted that Dr. Anwar indicated that Claimant had extreme limitation in the ability to carry out very short and simple instructions, but found only marked limitation in the ability to carry out detailed instructions. (R. 31, 599.) The ALJ also found Dr. Anwar's determination that Claimant could manage benefits in his own best interest inconsistent with his finding that much of Claimant's mental capacity was limited in marked and extreme ways. (R. 32.) The ALJ was entitled to take these inconsistencies into account in assessing Dr. Anwar's opinions. *See Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion so long as the ALJ provides an adequate explanation). "As long as the ALJ articulates his reasons, he may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician." *Streater v. Berryhill,* No. 16 CV 10943, 2017 WL 6625965, at *3 (N.D. Ill. Dec. 28, 2017) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)). *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (an ALJ "may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." We find these inconsistences were adequately articulated here.

In addition, the ALJ further discounted Dr. Anwar's opinion because he "did not specifically cite limitations in work-related terms." (R. 32.) The Court is puzzled by this

reasoning. The Mental Capacity Assessment is a comprehensive evaluation which required Dr. Anwar to analyze Claimant's functional abilities, grouped by understanding and memory function, concentration and persistence, social interaction function, and adaptation function. (R. 599–601.) The ALJ's expectations regarding "work-related terms" are unclear; however, we do not find that this statement of the ALJ requires remand.

Nevertheless, we do find that the ALJ improperly disregarded certain aspects of Dr. Anwar's opinion. The ALJ concluded that "the many marked and extreme x marks on the form do not match Dr. Anwar's own treatment notes reflecting improvement with medications, the need to see him only every two months, and the fact that within about 6 months of onset of the breakdown, Dr. Anwar has found the correct combination and dose of medication for claimant's bipolar depression." (R. 32.) We find that there are several flaws in this analysis. First, the Court is troubled by the ALJ's unsupported assumption that, because Dr. Anwar made no medication changes at the last visit of record (January 28, 2016), Claimant's medication regimen as of that date was "correct." (R. 32, 795.) The Court simply cannot accept this logic, especially when the records show that Dr. Anwar adjusted Claimant's medications eight times between July 1, 2015, and January 28, 2016. (R. 604, 609, 614, 780, 782–84, 786.) Moreover, at the majority of the visits during that time period where no changes were made, the records indicate that adjustments and additional medications were discussed, but Claimant opted to give the current medications more time to work before making any changes. (R. 779–81.) Together, these records suggest that Dr. Anwar believed Claimant's symptoms were not adequately controlled, thus lending support to his functional analysis. In any event, the

ALJ was not permitted to dismiss Dr. Anwar's opinion simply because he had made no changes in the medication regiment. *See McDonald v. Berryhill*, No. 16 C 1809, 2017 WL 3720176, at *7 (N.D. Ill. Aug. 29, 2017) (remanding where the ALJ held the treating physician's findings did not support disability because there had been no medication changes). Moreover, "it is well-recognized that bipolar disorder, like other disorders, is not static and changes with time and as medications are adjusted in accordance with a patient's symptoms." *Hill v. Astrue*, No. 09 CV 552, 2010 WL 3883236, at *8 (S.D. Ind. Sept. 27, 2010).

The Court is also not persuaded that Dr. Anwar's need to see Claimant "only every two months" is inconsistent with Dr. Anwar's opinions. (R. 32.) In this regard, the ALJ failed to build a logical bridge between the limitations assessed by Dr. Anwar and the frequency of his appointments with Claimant. The ALJ narrowly focused his attention on the January 2016 treatment note that recommends a follow-up visit in two months. The ALJ failed to consider, however, that Dr. Anwar recommended a follow-up in two months after Claimant's September 28, 2015 visit, yet Claimant's next visit took place just one month later, on October 26, 2015. (R. 613, 608.) The October 2015 note also suggests a follow-up visit in two months, but again, Claimant returned after only one month, on November 21, 2015. (R. 609, 603.); *McDonald,* 2017 WL 3720176 at *7 (finding that the ALJ improperly disregarded treating physician's opinions because the physician had recommended three month follow-up). Additionally, Dr. Anwar's notes include a place to indicate an anticipated return to work (RTW) date. (R. 604, 609, 614, 795.) The fact that Dr. Anwar did not include a RTW date in any of his records provides additional support for his opinions regarding Claimant's functional limitations.

The Seventh Circuit has frequently recognized "an all-too-common misunderstanding of mental illness. The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Scott*, 647 F.3d at 740; *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Larson*, 615 F.3d at 751; *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). The ALJ must consider the entire record, including those portions of the record that do not support the ALJ's ultimate determination. *Scrogham v. Colvin*, 765 F. 3d 685, 697 (7th Cir. 2014). As the Seventh Circuit has noted, it is especially important for the ALJ to evaluate the entire record in mental health cases, as mental illness often fluctuates. *Scott,* 647 F.3d at 740. By failing to address the evidence in Dr. Anwar's treatment notes supportive of a disability finding, the Court cannot determine whether the ALJ considered this evidence in making her determination.

Further, although the ALJ was not required to give Dr. Anwar's opinions controlling weight, she was still required to address the factors listed in 20 C.F.R. § 404.1527 to determine what weight to give the opinion. SSR 96-2p. SSR 96-2p states that treating source medical opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." (*Id.*). 20 C.F.R. § 404.1527(c); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). In this case, aside from identifying Dr. Anwar as Claimant's treating psychiatrist, it is not clear to the Court that the ALJ adequately considered several of the regulatory factors, including the nature and extent of the treatment relationship, the supportability of the decision, or the consistency of the opinion with the

record as a whole.  The ALJ's failure to "sufficiently account [ ] for the factors in 20 C.F.R. § 404.1527" prevents the Court from assessing the reasonableness of the ALJ's decision.  *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013).  For these reasons, the ALJ did not offer substantial evidence for rejecting the opinions of Dr. Anwar, which requires remand.

### 2. Dr. Khan and Dr. Joshi

Because remand is warranted based upon the ALJ's assessment of Dr. Anwar's opinions alone, the Court will only briefly address Claimant's similar arguments pertaining to the opinions of Drs. Khan and Joshi.  In giving these two opinions "some weight," the ALJ first noted that the assessments from Dr. Khan, a primary care provider, and Dr. Joshi, an infectious disease specialist, were almost identical.  (R. 32, 593–94, 596–97.)  Specifically, the ALJ stated:

> Because of the virtually identical nature of these two assessments from doctors at different practices treating claimant for different conditions, the impact of the assessments is diminished and I do not give them controlling weight; however, I give both assessments some weight.

(R. 32.)  With regard to Dr. Khan, the ALJ found the form to be "so extreme and without support," and noted that Dr. Khan's extreme assessments did not match Claimant's own reported level of activity.  (*Id.*)  As for Dr. Joshi, the ALJ noted that his form described all limits based on Claimant's HIV infection alone, which is asymptomatic and without complication.  "Thus, it is unclear and not explained how hand or sitting limitations result from this condition."  (*Id.*)

The Court finds that the reasons given by the ALJ for discounting the opinions of Drs. Khan and Joshi are sufficient.  However, even though the ALJ was not required to give these opinions controlling weight, she was still required to address the factors listed

in 20 C.F.R. § 404.1527 to determine what weight to give the opinions. SSR 96-2p. Other than identifying the doctors as treating physicians and noting their specialties, it is unclear to the Court whether the ALJ adequately considered the other regulatory factors. This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. The Court is not suggesting that the opinions of Dr. Khan and Dr. Joshi are entitled to controlling or significant weight, but only that greater elaboration and explanation is necessary to ensure a full and fair review of the evidence. *See Zurawski*, 245 F.3d at 888.

On remand, the ALJ shall reevaluate the weight to be afforded to the opinions of each of Claimant's treating physicians. If the ALJ finds "good reasons" for not giving the opinions controlling weight, the ALJ shall explicitly consider the appropriate regulatory factors in determining the weight to give each opinion. *See Moss*, 555 F.3d at 561.

## B. Remaining Issues

Because remand is required based upon the errors identified above, the Court need not address Claimant's remaining arguments at this time. The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and her ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009) ("on remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994).

## IV. CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied. This matter is remanded for further proceedings consistent with this Opinion.

DATED: February 5, 2018

_____
Michael T. Mason
United States Magistrate Judge